# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **WILBERT L. RICHARDSON,** : <br> Plaintiff : <br> : <br> v. : <br> : <br> **CITY OF PROVIDENCE, by and through its** : <br> **Treasurer, James J. Lombardi, III, alias,** : <br> **EMILIO MATOS, alias, in his individual and** : <br> **official capacity as a Providence Police officer,** : <br> **the STATE OF RHODE ISLAND, and** : <br> **JOHN DOES 1-10, individually and in their** : <br> **official capacities,** : <br>                **Defendants** : | C.A. No. 18- <br><br> **Jury Trial Demanded** |

## COMPLAINT

### I. Introductory Statement

1. Plaintiff Wilbert L, Richardson (hereafter "Plaintiff" or "Mr. Richardson") brings this civil rights action seeking compensatory and punitive damages and declaratory and injunctive relief, for acts and/or omissions of Defendants committed in violation of Plaintiff's right to freedom from malicious prosecution under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. §1983, and under Article I, §§2, 6, and 7 of the Rhode Island Constitution and under the common law of the State of Rhode Island.

2. This civil action stems from the arrest, detention, prosecution and continued detention and prosecution of Plaintiff by Defendant for the charges of murder, breaking and entering, conspiracy, and first degree robbery. Mr. Richardson spent ten months imprisoned at the Adult Correctional Institution and ten more months on home confinement, long past the time when Defendants knew that they were prosecuting Mr. Richardson for crimes he did not commit.

3. With no physical evidence whatsoever linking Plaintiff to the crime, Defendants failed in their duty to investigate even when their only evidence, a purported eyewitness

identification, which was at all times inconsistent with the known facts and otherwise not credible and unreliable, became suspect far beyond any objectively reasonable standard.

## II. Parties

4. Plaintiff Wilbert L. Richardson is a resident of the City of Cranston, County of Providence and State of Rhode Island.

5. Defendant City of Providence ("City") is a duly authorized and organized municipality under the laws of the State of Rhode Island and is sued by and through its Treasurer, James J. Lombardi, III, alias, the official designated by state law, R.I.G.L. §45-15-5, to be named in a suit for relief against the City.

6. Defendant Emilo Matos, alias is sued in his individual and official capacity as a police officer in the City Police Department.

7. Defendant State of Rhode Island is a sovereign state of the United States and is sued on the basis of the acts and/or omissions of its various agent and employees, including but not limited to those in the Department of the Attorney General involved in the indictment, detention, prosecution, and continued detention and prosecution of the Plaintiff. The State has waived both sovereign immunity and Eleventh Amendment immunity pursuant to R.I.G.L. §9-31-1.[1] The State is liable under the doctrine of *respondeat superior* for the acts and/or omissions of its agents, employees, and/or representatives committed in violation of State law complained of herein.

8. Defendants John Does 1-10 are sued in their individual and official capacities as agents, employees, and/or representatives of the City and/or State responsible for the arrest,

---

[1] *See e.g. Marrapese v. State of Rhode Island*, 500 F.Supp. 1207, 1222-23 (D.R.I. 1980) (no state sovereign immunity from claims under §1983 in light of statutory waiver which is "straightforward, uncomplicated and unreserved."). "[T]he Rhode Island Supreme Court has held that § 9–31–1 constitutes a broad waiver of sovereign immunity, including Eleventh Amendment immunity." *Pride Chrysler Plymouth, Inc. v. Rhode Island Motor Vehicle Dealers' License Comm'n*, 721 F. Supp. 17, 23 (D.R.I. 1989) (citing *Laird v. Chrysler Corp.*, 460 A.2d 425, 429 (R.I. 1983)).

detention, prosecution and continued detention and prosecution of Plaintiff by Defendant.

### III. Jurisdiction

9. This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343, 1367, 2201 and 2202.

### IV. Venue

10. Venue is proper in this Court since, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. §1391. Venue is also proper because a substantial part of the events and omissions giving rise to these claims occurred in the District of Rhode Island.

### V. Material Facts

11. On the morning of Saturday, October 5, 2013, Plaintiff Richardson was at home with his wife, Tanisha Richardson ("Mrs. Richardson") preparing to attend a funeral for Mr. Richardson's cousin.

12. Mr. and Mrs. Richardson woke up, bathed, dressed, and left their home at 9:30 a.m. to attend the funeral.

13. Other than a brief period of ten minutes when he walked to the corner store, Mr. Richardson was with his wife at home on DePasquale Avenue, or at the funeral surrounded by scores of people the entire morning of October 5, 2013.

14. Later that day, Mr. Richardson received a phone call from a friend, Edwin Otero ("Mr. Otero"), who told him that the police were investigating a home invasion at 124 Ontario Street in Providence.

15. Mr. Otero was referring specifically to the third floor apartment where he used to live with an individual named Jonathan Angilly ("Mr. Angilly").

16. Mr. Angilly, who still lived in the Ontario Street apartment, cultivated marijuana

in the dwelling and had done so when Mr. Otero lived there.

17. Upon information and belief, and despite the strict limitations set forth by his medical marijuana card, Mr. Angilly regularly sold the marijuana he cultivated in that third floor apartment.

18. Upon information and belief, Mr. Angilly told numerous people that he regularly stored marijuana in a container he referred to as his "black box."

19. At all relevant times, Mr. Angilly suffered from bipolar disorder and self-reports having gone to the Rhode Island Hospital emergency room approximately one hundred times seeking treatment for depression. *State of Rhode Island v. Wilbert Richardson*, PM-2014-0219, Bail Hearing, July 3, 2014 at 3-6. He estimated he had received psychiatric inpatient care at Butler Hospital thirty times since 2005. *Id.* at 5.

20. Mr. and Mrs. Richardson spent the rest of the day at the repast and with family, and neither of them heard anything more about the home invasion until later that evening, when Mrs. Richardson saw a news report that two men had been injured, one of them gravely, in a home invasion on Ontario Street.

21. Mrs. Richardson assumed this was related to what Mr. Otero had been talking about when he called earlier that day.

22. That morning of October 5, 2013, at approximately 8:30 a.m., Mr. Angilly had reported to Providence police that two men had entered his apartment, brutally pistol-whipped him, and demanded that he hand over the "black box."

23. According to what Mr. Angilly told police, his landlord and first floor neighbor, Delor "Dean" Cabral ("Mr. Cabral"), heard Angilly's cries for help and came to his assistance.

24. While Mr. Angilly "played dead" to protect himself, seventy-eight year old Mr. Cabral tried to fight off the intruders, and for his efforts was brutally beaten and left with a

broken neck, in a coma.

25.     Mr. Angilly was treated and released from the hospital later the same day with stitches for a head wound.

26.     When police arrived at 124 Ontario Street they found Mr. Angilly outside the three-family home.  He had left Mr. Cabral lying unconscious and alone in the apartment hallway, with injuries to the head and fresh cuts and bruises.

27.     Defendant Matos interviewed Mr. Angilly at 4:10 p.m. the afternoon of October 5, 2013.  During that interview, Mr. Angilly told Defendant Matos that one of the two men who broke into his apartment was Latino, and that the other was Black.

28.     Mr. Angilly told police that the Black man who entered his home was a friend of his ex-roommate Edwin Otero, and that this man had been to his home before on more than one occasion, yet the description of the assailant that Mr. Angilly provided did not match Mr. Richardson.

29.     For example, ***Mr. Angilly told Defendant Matos in at least two recorded conversations that the Black man who entered his home had no facial hair, or didn't have a beard.***  Interview of Jonathan Angilly by Emilio Matos, (Undated), at Providence Police Headquarters, p. 4 of 6; *State of Rhode Island v. Wilbert Richardson*, PM-2014-0219, Bail Hearing, July 3, 2014 at 36-37, 74-75..

30.     On October 5, 2013 and at all relevant times, ***Mr. Richardson had a full beard that covered his cheeks and chin completely***.

31.     Months later during cross examination at Mr. Richardson's bail hearing, Mr. Angilly claimed that he didn't mean to say the Black man had no beard, but rather that the assailant's face was covered by a bandana.  *State v. Richardson Bail Hearing*, July 3, 2014 at 29-37.

32. However, Mr. Angilly told Defendant Matos at multiple interviews in October, 2013 and repeated it on direct examination at the bail hearing, that he saw the assailant's face when the man's bandana "fell off" or "dropped." Interview of Jonathan Angilly by Emilio Matos, October 8, 2013 at Providence Police Headquarters, at 3 of 9.

33. On or about October 7, 2013, Defendant Matos interrogated Mr. Otero, and learned that the name of the friend who used to visit Otero at the Ontario Street apartment was Wilbert Richardson.

34. The only other witness police found was a neighbor, Jerome Monteiro ("Mr. Monteiro") who saw two men running from 124 Ontario Street.

35. Like Mr. Angilly, Mr. Monteiro described one of the suspects as Latino and the other as Black; however, Mr. Monteiro said he could not see the Black suspect's face because he covered it with his hand or shirt.

36. Neither Defendant Matos nor any other Defendant asked Mr. Monteiro for important descriptive details of the Black man he saw, such as what the top portion of his face looked like, or even his skin tone.

37. The description that Mr. Monteiro did volunteer also did not match Mr. Richardson--during a recorded interview on October 7, 2013, ***Mr. Monteiro told Defendant Matos that the Black man he saw leaving 124 Ontario Street had hair and was not bald.*** Interview of Jerome Monteiro by Emilio Matos, October 7, 2013 at 8.

38. On October 5, 2013 and at all relevant times, ***Mr. Richardson was completely bald, with his head cleanly shaven.***

39. During the October 7 interview, Mr. Monteiro told Defendant Matos that when he spoke with Mr. Angilly outside 124 Ontario Street immediately after the attack, ***Angilly described the home invasion but made no mention of knowing either of the suspects.***

40. Mr. Monteiro was shown a photo array from which he identified the co-defendant arrested for this crime, Joel Valdez ("Mr. Valdez"), as the Hispanic man whom he saw fleeing from his neighbors' house on October 5.

41. Mr. Valdez had been identified by Providence Police from a fingerprint left in Mr. Angilly's apartment, and consequently his photo was included in the array that Mr. Monteiro viewed.

42. ***At no point did Defendants ever show Mr. Monteiro any photo array including Mr. Richardson to see if he could identify Mr. Richardson from the top portion of his face.***

43. On Thursday evening, October 10, Mr. Richardson received a phone call from a friend telling him that his name and picture were in the news as wanted by police, one of countless media reports over the next several months portraying Mr. Richardson as a murderer.

44. Immediately Mr. Richardson, accompanied by Mrs. Richardson, went to the Providence Police Department headquarters, where he presented himself to police.

45. Mr. Richardson waited in the lobby for several minutes with Mrs. Richardson, until police officers came out, shoved him against the wall, kicked his legs apart, and arrested him.

46. Police personnel refused to give Mrs. Richardson any information as to why her husband was being arrested; only when she arrived home that night and saw the news did she learn of the crime he was accused of committing.

47. The next morning, Friday, October 11, 2013, Mrs. Richardson watched through the front window of her second floor home as her youngest daughter set out for school.

48. A few minutes later, Mrs. Richardson heard someone calling her name, and looking out the window again saw two unknown individuals at the door.

49. Mrs. Richardson opened the outer door of the three-family home to see who was

calling. Her daughter, alarmed, had come back toward the house and managed to get inside and upstairs before approximately six heavily armed police officers swept past Mrs. Richardson and spread out on the staircase leading to her apartment.

50. One of the officers yelled at her, "You know who we want, we're looking for Wil Richardson!," or words to that effect.

51. When Mrs. Richardson protested and tried to explain that her husband had already turned himself in, a detective approached and confirmed to the other officers that Mrs. Richardson was correct. The detective added that Mrs. Richardson should go to the police department to provide a statement.

52. A short time later, Mrs. Richardson went to the Providence Police Department where she provided a statement to Defendant Matos.

53. She told Defendant Matos that Mr. Richardson had been home with her the morning of October 5, 2013 and that they left for the funeral at approximately 9:30 a.m.

54. Mrs. Richardson brought her husband's phone with her to the interview, and turned it over to Defendant Matos after he presented her with a consent to search form signed by Mr. Richardson.

55. Detective Matos told Mrs. Richardson that the information police got from the phone would either "implicate [Mr. Richardson] or exonerate him." Interview of Tanisha Richardson by Emilio Matos, October 11, 2013 at 12.

56. On or about October 15, 2013, Defendant Matos and another Providence Police officer executed a search warrant on Mr. and Mrs. Richardson's home.

57. ***Despite a thorough search of his home, they found no evidence of any type connecting Mr. Richardson to the home invasion.***

58. On November 4, 2013, Mr. Cabral's son contacted Defendant Matos and informed

him that his father had died from the injuries he received on October 5, 2013.

59. Defendant Matos visited Mr. Richardson at the ACI on November 25, 2013, and was present when Providence Police took a buccal swab to sample Mr. Richardson's DNA.

60. On information and belief, Mr. Richardson's DNA did not match any samples gathered from the crime scene.

61. During that visit, Defendant Matos told Plaintiff Richardson that if the sample came back negative as to matching any crime scene samples, that Matos would personally make sure that Mr. Richardson was released.

62. *At some point in December, 2013 Defendant Matos told Mrs. Richardson during one of the telephone calls he made to her regularly, words to the effect of, "I don't believe your husband did this. I think we got the wrong guy."*

63. On January 10, 2014, the court ordered a bail hearing for Mr. Richardson, pursuant to his statutory and state constitutional right to due process. [2]

64. Rhode Island Superior Court Rules of Criminal Procedure set forth a process whereby even a person charged with capital crimes, such as those alleged against Mr. Richardson, has a right to a bail hearing "at the earliest practical date." Super.R.Crim.P. 5(a).

65. Rhode Island law is clear that two weeks should be considered the longest a criminal defendant should wait to be heard, whether for a bail revocation hearing or the initial hearing to set bail.[3]

---

[2] **§12-13-1.1. Hearings when state opposes bail.** (a) In all cases where the state opposes the granting of bail in respect to offenses punishable by imprisonment for life and/or offenses involving the use or threat of use of a dangerous weapon by one already convicted of the an offense or of an offense punishable by imprisonment for life pursuant to the provisions of R.I. Const., Art. I, Sec. IX, hearings shall be held in the superior court unless arrangements are made by the parties for a stenographic or electronic recording of proceedings in the district court. Article I, Section 9 of the Rhode Island Constitution states that the right to bail may be denied in capital cases " when the proof of guilt is evident or the presumption great."

[3] "An arrested person has the '* * * right to be admitted to bail in a proper case within a reasonable time following his arrest.' *State v. Wax*, 318 R.I. 319, 328, 116 A.2d 468, 472 (1955). ...While we eschew the temptation to formulate a neat schedule of minimum and maximum time frames, we do find that a 2-week delay, absent a

66. Although the January 10, 2014 Order for a Bail Hearing was issued two-and-a-half months beyond the time limits countenanced by the Supreme Court of Rhode Island, on nine (9) separate occasions after that Order was issued, a scheduled bail hearing was either vacated by the court or continued.

67. Finally, Mr. Richardson was able to challenge his ten-month imprisonment at a bail hearing, held July 3, 4, and 7, 2014.

68. In addition to screaming and cursing during and after his testimony, Mr. Angilly contradicted his previous statements as to what he observed and his physical description of Mr. Richardson.

69. At the bail hearing, Defendant Matos spoke with Mrs. Richardson in the hallway outside of the courtroom. Defendant Matos told Mrs. Richardson that he was responsible for bringing Mr. Angilly to and from court for the bail hearing.

70. During this conversation with Mrs. Richardson at the bail hearing, Defendant Matos said words to the effect of "Tanisha, the guy [Angilly] is a loose cannon – he's crazy." As soon as Defendant Richardson spoke those words, Mr. Angilly came rushing out of the courtroom screaming and swearing.

71. The bail hearing on July 7, 2014 concluded with the court ordering that Mr. Richardson be released to community confinement with a surety bail of $35,000.00.

72. Testimony at the bail hearing confirmed what the inconsistent and non-existent evidence uncovered to date in the investigation had already revealed: that the prosecution's key witness against Mr. Richardson, Jonathan Angilly, lacked credibility and that Mr. Richardson was not guilty of any crime and was being wrongfully accused and detained.

73. ***Prior to the bail hearing, the Defendants were aware of the following evidence***

---

defendant's consent, is not be countenanced." *Mello v. Superior Court*, 117 R.I. 578, 586-87, 366 A.2d 1262, 1266 (R.I. 1977).

*or lack thereof:*

> a. *The assailant had no beard, while Mr. Richardson had a prominent one.*
>
> b. *The assailant had hair, while Mr. Richardson did not; he was bald with a shaven head.*
>
> c. *Mr. Richardson was cleaned, dressed and leaving his home at approximately 9:30 a.m. to attend a 10:00 a.m. funeral, which could be confirmed by numerous independent third-parties present at the services.*
>
> d. *Mr. Richardson had a verifiable alibi: prior to leaving for the funeral, Mr. Richardson was at home with his wife.*
>
> e. *No DNA samples at the crime scene matched Mr. Richardson's.*
>
> f. *No finger prints found at the scene matched Mr. Richardson's.*
>
> g. *Nothing found at the scene was connected to Mr. Richardson.*
>
> h. *Nothing found at Mr. Richardson's home connected him to the scene.*
>
> i. *Nothing on Mr. Richardson's cell phone connected him to Mr. Angilly or the co-defendant individual arrested and charged in connection with the crimes.*
>
> j. *Mr. Richardson made no attempt to flee and voluntarily reported to the police station immediately upon learning that he was wanted by police.*
>
> k. *When he reported to the police station, his body did not contain any signs whatsoever of having been involved in a violent, physical conflict with two adult males just days before.*
>
> l. *There was nothing connecting Mr. Richardson with the co-defendant individual arrested and charged in connection with the crimes.*
>
> m. *Mr. Angilly's identification was inherently unreliable in light of the fact the he was being severely beaten and battered at the time he purportedly observed his*

*assailant, the fact that the assailant's face was covered by a bandana, and his history of mental illness.*

74. Following the bail hearing, Defendants' actions made it clear that they knew more clearly than ever that their case against Plaintiff Richardson was nothing more than a sham.

75. From that date forward if not earlier, the Defendants' actions were transparent attempts to maintain the pretense that they had arrested the correct suspect in order to flush out the real perpetrator and/or to limit their own liability for the terrible mistake they had made.

76. The bail hearing concluded on July 7, 2014 and *the very next day*, the Rhode Island Department of Attorney General ("Attorney General" or "AG") filed an indictment against Mr. Richardson for two counts of Murder, Breaking and Entering a Dwelling (R.I.Gen.Law §11-8-2(a)), Conspiracy (R.I.Gen.Law §11-1-6), and First-degree Robbery (R.I.Gen.Law §11-39-1(a))—*despite the dozen reasons reinforced and verified at the bail hearing recited above in ¶74 confirming that Mr. Richardson was not the perpetrator.*

77. Also on July 8, 2014, the Rhode Island Department of Attorney General filed an indictment for similar counts against the co-defendant individual who had been arrested in connection with the crimes, Joel Valdez—an individual with whom the Plaintiff had no connection whatsoever.

78. On July 23, 2014, Associate Justice Netti C. Vogel ("Judge Vogel") ordered the Rhode Island Department of Corrections to release Mr. Richardson to home confinement.

79. Releasing Mr. Richardson from complete incarceration to home confinement reflects the knowledge by Defendants that their prosecution of Plaintiff Richardson was completely and objectively unreasonable:

80. *Indeed Judge Vogel issued this order despite the fact that Mr. Richardson, while*

*facing a charge of murder, was statutorily ineligible for community confinement.*[4]

81. The Assessment and Eligibility Coordinator from the Rhode Island Department of Corrections Community Confinement Program, Arlene Manuel, provided an eligibility report to the court that clearly stated Mr. Richardson was not eligible for home confinement due to the statutory restriction.

82. The decision to place Mr. Richardson in home confinement, despite the clear legal prohibition, is evidence of the actual and constructive knowledge by Defendants that there was no probable cause to connect Mr. Richardson to this crime, and that their complaining witness lacked credibility.

83. Mr. Richardson remained under complete physical control of the Department of Corrections, with an electronic monitoring bracelet affixed to his ankle, until April 15, 2015 – more than nine months after the bail hearing established that the prosecution's case against Mr. Richardson lacked probable cause.

84. The charges against Mr. Richardson were not dismissed until May 11, 2015, one year, seven months, and two days after he was arrested for a murder he did not commit.

85. Eleven days after charges against Mr. Richardson were dismissed, an indictment was filed against Leopoldo Belen for the murder of Mr. Cabral.

86. As a direct and proximate result of the Defendants' acts and/or omissions, including, but not limited to, those described herein, the Plaintiff has, among other things, suffered deprivation of his state and federal constitutional rights.

*Municipal Liability*

87. Defendant City failed to properly select, train, instruct, supervise and/or discipline

---

[4] R.I. Gen. Laws §42-56-20.2. Community confinement**.** *(a) Persons subject to this section.* Every person who shall have been adjudged guilty of any crime after trial ..., ...and every person awaiting trial at the adult correctional institutions ("detained person") who meets the criteria set forth in this section shall be subject to the terms of this section except:   * * * (3)  (ii) Any person currently adjudged guilty of or sentenced for or detained on any capital felony.

officers in the Defendant City Police Department, including Defendant Matos and various Defendant John Does, relative to the a) constitutionally protected rights of individuals to be free from search and seizure, detention, and prosecution without probable cause, b) the duty to continue to investigate where a purported eye witness identification lacks credibility; and, c) the duty to cease continued detention and prosecution where further investigation establishes and/or confirms the lack of probable cause.

88. On information and belief, during all relevant time periods, a custom or policy existed in the Defendant City Police Department wherein the Defendant City acquiesced to, permitted, condoned, encouraged and/or was deliberately indifferent to the deprivation of constitutionally protected rights caused by a) search and seizure, detention, and prosecution without probable cause, b) the failure to continue to investigate where a purported eye witness identification lacks credibility; and, c) the failure to cease continued detention and prosecution where further investigation establishes and/or confirms the lack of probable cause.

89. On information and belief, during all relevant time periods, a custom or policy existed in the Defendant City Police Department wherein the Defendant City acquiesced to, permitted, condoned, encouraged and/or was deliberately indifferent to the deprivation of constitutionally protected rights caused by charging, indicting, detaining and/or prosecuting and/or continuing to detain and prosecute individuals without probable cause for the purpose of flushing out the real perpetrator and/or to limit legal liability for arrest, detention, and/or prosecution of individuals without probable cause.

90. Despite such knowledge, Defendant City, by and through their policy-making officials and agents, approved, acquiesced to, condoned, intentionally ignored, or were deliberately indifferent to such practices, and failed to change or eliminate such unlawful customs or policies.

*Unknown Defendants*

91. On information and belief, Defendants John Does 1-10, including but not limited to Defendant City and Defendant State policy-makers and decision makers, individually and/or jointly with other Defendants, proximately caused, materially participated in, and/or were otherwise responsible for the arrest, detention, prosecution and continued detention and prosecution of Plaintiff without probable cause as complained of herein.

*Intentional Conduct*

92. At all relevant times, Defendants acted intentionally, willfully, maliciously, and/or with deliberate, reckless, or callous indifference to Plaintiffs' clearly established constitutional rights.

93. Furthermore, at all relevant times, Defendants knew or should have known that their conduct would cause or contribute to the deprivation of Plaintiffs' clearly established constitutional rights.

94. At all relevant times, Defendants were motivated by malice, wantonness and/or willfulness of an extreme nature.

*Harm and Damages*

95. As a direct and proximate result of the Defendants' acts and/or omissions, including but not limited to those described herein, the Plaintiff has suffered and will continue to suffer personal injury, pain and suffering, emotional distress, pecuniary harm, loss of liberty, injury to his reputation, deprivation of his constitutional and common law rights, and has been forced to incur expenses for legal services.

## VI. Claims for Relief

96. Plaintiffs incorporate in the counts below the allegations contained in ¶¶1 through 95 above.

## COUNT ONE
*Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments, Actionable through 42 U.S.C. § 1983*

97. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff without probable cause and with malice, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

## COUNT TWO
*Malicious Prosecution in Violation of Article 1, §§2, 6 and 7 of the Rhode Island Constitution*

98. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff, without probable cause and with malice, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, §§ 2, 6 and 7 of the Rhode Island Constitution, directly actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

## COUNT THREE
*Common Law Malicious Prosecution*

99. Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff Richardson without probable cause and with malice, in violation of the common law of the State of Rhode Island, causing Plaintiff Richardson to suffer harm as aforesaid.

## VII. Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1. A declaratory judgment that the Defendants, in the manner described herein, violated Plaintiff's right to be free from malicious prosecution under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, Article 1, §§ 2 and 6 of the Rhode Island Constitution, directly actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989), and under the laws of the State of Rhode Island.

2. Preliminary and permanent injunctions directing Defendants City and State to properly train, supervise, and discipline their agents relative to the a) constitutionally protected rights of individuals to be free from search and seizure, detention, and prosecution without probable cause, b) the duty to continue to investigate where a purported eye witness identification lacks credibility; and, c) the duty to cease continued detention and prosecution where further investigation establishes and/or confirms the lack of probable cause and thereby avoid such egregious constitutional violations in the future.

3. Preliminary and permanent injunctions directing the Defendants from either individually and or jointly charging, indicting, detaining and/or prosecuting and/or continuing to detain and prosecute individuals without probable cause for the purpose of flushing out the real perpetrator and/or to limit legal liability for arrest, detention, and/or prosecution of individuals without probable cause.

4. An award of compensatory damages.

5. An award of punitive damages.

6. An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988.

7. Such other and further relief as this Court deems just and proper.

## VIII. Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX. Designation of Trial Counsel

Plaintiff hereby designates Shannah M. Kurland, Esquire, as trial counsel.

Plaintiff, **Wilbert Richardson**
By his attorneys,

Date: **May 7, 2018**        /s/ Shannah Kurland
**Shannah Kurland, Esq**. (#9186)
149 Lenox Avenue
`                                                  Providence, RI 02907
Phone: (401) 439-0518; FAX: (401) 739-9040
skurland.esq@gmail.com


/s/ Richard A. Sinapi
**Richard A. Sinapi, Esq.** (#2977)
**SINAPI LAW ASSOCIATES, LLC.**
2374 Post Road, Suite 2013
Warwick, RI 02886
Phone: (401) 739-9690; FAX: (401) 739-9040
ras@sinapilaw.com